## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. _____

CHAD W. STRYKER,

Plaintiff,

v.

ROOF DEPOT d/b/a BEACON SALES ACQUISITION, INC.,
a Delaware corporation,
Defendant.

---

## COMPLAINT

---

Plaintiff, Chad W. Stryker, by and through his undersigned attorney, for his Complaint against Defendant Roof Depot d/b/a/ Beacon Sales Acquisition and respectfully alleges as follows:

### NATURE OF THE CASE

1.      This is a Complaint for violations of the Americans with Disabilities Act of 1990, 42 U.S.C. §12101 et. seq., as amended by the ADA Amendments Act of 2008 ("ADAAA"), the Rehabilitation Act of l973, 29 U.S.C.§701 et. seq., and the Colorado Anti-Discrimination Act, C.R.S. 24-34-401 et. seq., and for Workers' Compensation retaliation in violation of public policy.

### JURISDICTION AND VENUE

2.      The jurisdiction of this Court is invoked pursuant to 28 U.S.C. 1331 (Federal Question Jurisdiction) 28 U.S.C. §1332 (Diversity Jurisdiction), and 42 U.S.C. 334 (Civil Rights Jurisdiction), and 42 U.S.C. §1367 (Supplemental Jurisdiction). Plaintiff's claims are based on Federal Law under the Americans with Disabilities Act of 1990, 42 U.S.C. §12101 et. seq., as

amended by the ADA Amendments Act of 2008, the Rehabilitation Act of l973, 29 U.S.C. § 701, et. seq., and State Law pursuant to the Colorado Anti-Discrimination Act, C.R.S. § 24-34-401 et. seq.

3.      Plaintiff has complied with all conditions precedent to the filing of this Americans With Disabilities Act Claim. A copy of the Right to Sue letter issued by the U.S. Equal Employment Opportunity Commission is attached hereto and incorporated herein by this reference. Ex.1

4.      The work-related injury in question occurred on October 25, 2016, subsequent to the effective date of the ADA Amendments Act of 2008 on January 1, 2009.

5.      Venue is proper in this Judicial District under 28 U.S.C. § 1391(b)(c) and 42 U.S.C. §12101, because Defendant has offices, conducts business, and can be found in this District, and the causes of action arose and the acts and omissions complained of occurred therein.

### PARTIES

5.      At all times relevant, Plaintiff Chad Stryker was a resident of Colorado with a residence located at 773 S. Traildust Drive, Milliken, Larimer County, Colorado 80534.

6.      Subsequent to the filing of Plaintiff's Charge of Discrimination with the Colorado Civil Rights Division and the U.S. Equal Employment Opportunity Commission, Plaintiff relocated to 8833 108th Street N., Seminole, FL 33772.

7.      At all times relevant, Defendant Roof Depot d/b/a Beacon Sales Acquisition, Inc., was and is a Delaware corporation authorized to do business in the State of Colorado (ID #20091420472) with its principal place of business located at 505 Huntmar Park Drive, Suite 300, Herndon, VA 20170.

8.      Defendant does business in Colorado under its trade name Roof Depot, and has a business located at 227 S. Lincoln, Fort Collins, Larimer County, Colorado 80534.

**GENERAL ALLEGATIONS**

9.      On August 17, 2016, Plaintiff was hired for a fulltime, non-seasonal position by Jake Lord ("Lord"), the Defendant's Branch Manager for its Fort Collins Roof Depot facility.

10.      Plaintiff, who has his CDL license, was hired as a freight delivery driver responsible for delivery of roofing materials to construction sites.

11.      At all times relevant, Plaintiff performed his job satisfactorily and, in fact, often filled in for Defendant's jobs in other of its locations.

12.      However, on October 25, 2016, while finishing a delivery in Castle Rock, Colorado, Plaintiff suffered a work-related injury. He stepped off a pallet and his foot landed on a rachet/strap causing his left ankle to severely roll outward.  As his ankle rolled outward, he heard a loud internal pop.

13.      Plaintiff immediately called Jake Lord, the Branch Manager, to tell him what happened and that he thought he had torn his ankle.

14.      Lord told him that either he or the Safety Manager for the area would call him back to tell him where to go for treatment.

15.      Lord called Plaintiff to tell him to meet Lord at the address of a doctor in Aurora, Colorado.

16.      As Plaintiff was driving to the Doctor's clinic, Allen, the Safety Manager, called Plaintiff to get a statement regarding the injury incident.

17.      When Plaintiff arrived at the "Aviation & Occupational Medicine" clinic, the Defendant's Workers' Compensation doctor's office, he was met by Lord.

18.     They met with the physician's assistant, Amelia Carmosino. Plaintiff told her how he injured his left ankle and that he believed that he had torn ligaments.  He had suffered a similar injury to his right ankle a decade earlier.

19.     X-rays were taken of his ankle which came back negative for structural damage, but could not show whether there was damage to the ligaments which would require an MRI.

20.     When Ms. Carmosino began to discuss scheduling an MRI, Jake Lord interceded adamant that an MRI was not necessary.  He argued that this ankle injury was a common injury in their line of work.

21.     At this point, Lord asked the Plaintiff if he would agree with the company paying him to stay home and rest up hoping that the injury was just a severe sprain. He explained that the company had done this with other employees and that his injury would probably recover in about a month.

22.     Plaintiff was indecisive at first but he did not know for sure whether his injury was a sprain or torn ligaments.

23.     Plaintiff had only worked for Defendant for approximately three months and he trusted Jake Lord. He worried about his job and he wanted to be a "team player," so he agreed.

24.     Thus, rather than filing a Workers' Compensation claim, as should have been done, Defendant directed the doctor to indicate that on the injury paperwork that Plaintiff was still working with "no restrictions," but that his Maximum Medical Improvement ("MMI') was unknown.

25.     Ms. Carmosino suggested an air boot until further notice and asked if Plaintiff needed one. Again, Lord interceded offering to buy an air boot, crutches and ibuprofen.  He stated that

anything that Plaintiff got from the Workers' Compensation doctor could make this injury a recordable incident. Since Plaintiff still had an air boot from the prior injury, he did not ask for help in this regard.

26.     After a few days of rest, on October 28, 2016, Plaintiff had another doctor's appointment, and Plaintiff was told that "Allen," the Safety Manager, would meet him there.

27.     Plaintiff was disturbed by the dismissive attitude of Doctor Childers at this appointment. Dr. Childers vaguely tugged on Plaintiff's ankle saying that it felt strong and sturdy, even though Plaintiff had no range of motion, but swelling, had severe pain and could not bear any weight on the ankle.

28.     Although Plaintiff did not understand at the time, he later realized that Defendant and its employees were trying to manipulate the situation so it was not a Workers' Compensation claim or an OSHA recordable event.

29.     At this point, due to the pain, Plaintiff was totally disabled because he could not walk, stand or sleep.  He needed help from family for household services.

30.     When Allen told Dr. Childers about the agreement that the company had with the Plaintiff, he directed the doctor to prepare incorrect paperwork again indicating that the Plaintiff was still working, had no restrictions, and that his MMI was unknown.

31.     In the meantime, Jake Lord was moved from the Defendant's Fort Collins facility to the Aurora facility, and Scott Odekirk ("Odekirk") became the new Fort Collins Branch Manager. Mr. Odekirk had no knowledge of the Defendant's insistence that Plaintiff remain at home to

ed

recover.

32.     Thus, Allen attended the Plaintiff's next appointment on November 11, 2016.  Although the Plaintiff thought that his ankle had improved slightly, his range of motion was still restricted, so he was sent home again. Defendant had incorrect paperwork prepared again.

33.     On November 28, 2016 at the Plaintiff's next appointment, he met with Ms. Carmosino and they agreed that since Plaintiff's recovery had plateaued and he still had seriously restricted range of motion, it was time to schedule an MRI. However, when Odekirk arrived and discovered that Plaintiff was going to have an MRI, he became angry. Okekirk stated that an MRI was not necessary and that Plaintiff's injury was just a "bad" sprain.

34.     Ms. Carmosino explained the facts of the injury and recovery which indicated that there was something more substantially wrong.  Also, she explained to Odekirk that the MRI would not be a recordable incident if the MRI report did not show a tear in Plaintiff's ankle.

35.     At this point, the Defendant knew or should have known that Plaintiff had suffered a severe disabling injury, but Defendant was more worried about its safety ratings.

36.     When Plaintiff tried to schedule the MRI, he was told that it could not be scheduled because the Defendant's insurance company was not aware of the incident. Consequently, Plaintiff had to contact Odekirk and Allen to get all of the paperwork submitted so he could have the MRI.

37.     When Plaintiff spoke with the Defendant's insurer, Travelers Insurance, regarding the

MRI it had been nearly 2 months since his injury.  The insurance agent was shocked by Defendant's handling of Plaintiff's claim.

38.    The MRI was performed, and on December 7, 2016, Plaintiff met with Dr. Michael Ludwig, a Workers' Compensation doctor to review the results. One of Defendant's managers attended this appointment.  The MRI showed that Plaintiff had torn two ligaments on the outside of the left ankle.

39.    Although the paperwork showed the Plaintiff was still working, he was given new temporary restrictions "no walking or standing, and 8 hours of sitting." Further the paperwork showed that his MMI was unknown.

40.    The following week Plaintiff met with a specialist, Dr. Resig, at Denver Vail Orthopedics. Defendant's former Fort Collins manager, Jake Lord, attended this appointment. Dr. Resig did not think the injury would require surgery unless it proved to be unable to regain stability.  The doctor prescribed six weeks of physical therapy twice per week.

41.    Being required to stay home in pain and without adequate medical treatment caused Plaintiff's ongoing depression to be exacerbated.

42.    Since Plaintiff had computer skills, he had requested accommodations by working in the office.  He was told there was no office work available.

43.    The Defendant did not engage in any interactive process to determine adequate accommodations for Plaintiff.

44.     In fact, rather than discussing possible accommodation Defendant retaliated against
Plaintiff. Defendant's Fort Collins Branch Manager, Odekirk, called Plaintiff on December 21,
2016 demanding that Plaintiff show up "ready to go", because Plaintiff was clearly healthy since
he did not have a doctor's note. Odekirk stated that the "Safety Committee" had reviewed his
paperwork and, because it said he was still working, they concluded it was time for him to
return to full duty.

45.     Plaintiff was confused by these accusations by Odekirk. It was Defendant that instructed
Plaintiff to stay home and it was Defendant that directed the doctors to misrepresent on the
paperwork that Plaintiff was working.

46.     On this same date, December 21, 2016, Plaintiff's restrictions were changed to sedentary
and they were faxed to Defendant.

47.     Plaintiff attempted to explain the situation to Odekirk, who was not the Branch Manager
at the time Defendant directed Plaintiff to stay home to recover and to pay him to do so. Plaintiff
told Okekirk that had Plaintiff's injury been handled properly through Workers' Compensation
he would have been back to work and his injury would not have been exacerbated by not being
allowed to get the medical treatment he needed. Plaintiff became upset and tried to reason with
Odekirk, explaining that it would hinder his recovery to be at the warehouse on concrete floors
and unable to elevate his ankle. Nevertheless, Odekirk demanded that Plaintiff show up the next
day December 22, 2016, even if only to sit there for a full 8-hour day, basically stating that this
is how he would recover, when he was not in physical therapy.

48.     When Plaintiff arrived at the Fort Collins branch at 6:00 a.m., he apologized to Odekirk for being so upset the day before. However, Odekirk was hostile and argued about Plaintiff's medical treatment by Defendant, rehashing the arguments they had on December 21, 2018. Okekirk told Plaintiff that Defendant had gone out of its way to pay him to stay home to recover, and could only cover some of the cost by using all Plaintiff's vacation and sick time. Plaintiff was never told that his benefits were being used.

49.     Odekirk was rude and adamant in his response to Plaintiff.  Plaintiff could no longer take the abuse and he broke down, weeping. Plaintiff told Odekirk that Defendant was putting the entire blame on him even though Defendant was dictating his recovery rather than allowing him to receive the treatment he needed. Then he confided that his depression caused by not being able to work was overwhelming. Finally, he asked Odekirk to put him on Workers' Compensation. They began to talk about the steps necessary to put Plaintiff on Workers' Compensation.

50.     They agreed that the idea of having Plaintiff recover at the warehouse was not going to work and it would hinder his recovery. Odekirk stated he would discuss this with the Safety Committee and his supervisors. In the meantime, Plaintiff would stay at the warehouse. However, after four to five hours Plaintiff experienced pain and cramping in his left leg, so he told Odekirk about it.  So, Odekirk told Plaintiff to go home and he would contact him with the company's decision.

51.     At Plaintiff's first physical therapy appointment on December 27, 2016, he told the therapist what had happened to his leg when he was at work. The therapist told him if that's how

his leg reacted to only six hours on that surface, 8 hours a day everyday was going to seriously hinder his recovery. Further, since Plaintiff was trying to use a brace which offers less stability and cushion, he sent the Plaintiff next door to speak with Dr. Ladwig.

52.     On December 27, 2016, Plaintiff 's Workers' Compensation doctor, Dr. Ladwig changed his temporary restrictions again to "sedentary but on no concrete surfaces."

53.     Plaintiff immediately called Odekirk to notify him of the change in his restrictions and to ask if he had heard from his supervisors. He said he would contact Plaintiff.

54.     Odekirk called Plaintiff asking him to come meet with him. On December 29, 2016, Plaintiff had a short meeting with Odekirk who handed him a letter of termination.

55.     Plaintiff was retaliated against for seeking Workers' Compensation benefits and pretextually terminated from his employment. Defendant alleged that due to the winter conditions there had been a decline in business, which was untrue.

56.     Plaintiff could not heal properly due to the willful and wrongful actions of Defendant, its agents and employees, and his grossly inadequate medical care caused by Defendant's refusal to allow him to file a Workers' Compensation.

57.     Moreover, the facts show that Defendant wrongfully back dated the Workers' Compensation First Report of Injury to October 25, 2016. In fact, the First Report of Injury was not filed until December 29, 2016, and there was no admission of liability until January 8, 2017.

58.     The willful and intentional actions of Defendant caused Plaintiff to further suffer severe emotional distress, anguish, harms upset, and pain and suffering, and significantly hindered the healing process.

**FIRST CLAIM FOR RELIEF**
**(Violations of the ADA and the ADAAA, the Rehabilitation Act of 1973,**
**and the Colorado Anti-Discrimination Act C.R.S. §24-34-401 *et. seq.*)**

59.     Plaintiff incorporates by this reference all preceding paragraphs as though fully set forth herein.

60.     Despite his actual or perceived disabilities, Defendant, its agents, and employees denied Plaintiffs rights under the ADA and the ADAAA.

61.     Plaintiff asked Defendant if he could work half days in the office, but he was told there was no work. Rather than enter into an "interactive process" to determine reasonable accommodations, the Defendant did nothing.

62.     Defendant did not comply with any of its obligations under the ADA and the ADAAA.

63.     As a direct and proximate result of the acts and omissions described herein, Plaintiff has suffered and incurred, or may be reasonably expected to incur the following damages and other losses, including but not limited to: lost income or employment compensation and fringe benefits, thereby justifying appropriate awards to Plaintiff of front pay and back pay; damage to reputation and character, credit and credit worthiness, emotional or mental anguish, distress, upset, humiliation, embarrassment, or degradations, pain and suffering; and other consequential, incidental, or related damages to Plaintiff's employment rights, privileges, interests, as well as statutory interest, and a reasonable attorney's fees and costs.

## SECOND CLAIM FOR RELIEF
## (RETALIATION IN VIOLATION OF PUBLIC POLICY)

64.     Plaintiff incorporates by this reference all preceding paragraphs as though fully set

forth herein.

65.     Plaintiff had a right to enter into a contract for employment with Defendant with the

reasonable expectation that the Defendant would treat him lawfully, fairly and without retaliation

in compliance with all requirements of law, specifically Plaintiffs right to file and pursue a

Workers' Compensation claim, pursuant to the Colorado Workers' Compensation Act, in

accordance with the holding in <u>Lathrop v. Entenmann 's Inc.</u>, 770 P.2d 1367 (Colo. App. 1989).

66.     Immediately upon notification of Plaintiff's injury, Defendant dissuaded the Plaintiff

from filing a Workers' Compensation claim.  Defendant promised that it would pay the Plaintiff

his salary so he could stay home to recover.  Defendant asserted to Plaintiff that it had regularly

provided such compensation and arrangements to other injured employees.

67.     The foregoing actions and omissions by the Defendant violated public order and policy

as set forth by the Colorado legislature under the Workers' Compensation Act, as amended,

C.R.S. 8-14.5-101 *et. seq.*

68.     Defendant engaged in retaliatory acts as set forth herein that inhibited or delayed the

Plaintiffs ability to recover from his injuries.

69.     As a direct and foreseeable, and proximate result of Defendant's acts and omissions,

Plaintiff has suffered and will continue to suffer the foregoing damages and harm as may be

proven at trial.

        WHEREFORE, Plaintiff prays for an award of all relief requested herein, including

such compensatory and economic damages as may be proven, plus interest, and an award of

reasonable attorney's fees and costs, and for such other relief that the Court deems just and proper and consistent herewith.

Dated: December 27, 2019

Respectfully submitted,

*/s Richard K. Blundell*
Richard K. Blundell, Esq.
CO Attorney Registration No. 10358
3535 West 12th Street, Suite D
Greeley, CO 80634
Tel.: (970) 356-8900
Fax: (970) 353-9977
rick@rkblaw.net

ATTORNEY FOR PLAINTIFF

Plaintiff's Address
Chad Stryker
8833 108th Street N.
Seminole, FL 33772.